IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANERO MITCHELL, | ) | CASE NO. 4:17CV01724 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JACK ZOUHARY |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| ALAN J LAZAROFF,[1] | ) | JONATHAN D. GREENBERG |
| Warden | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is

the Petition of Janero Mitchell ("Mitchell" or "Petitioner"), for a Writ of Habeas Corpus filed

pursuant to 28 U.S.C. § 2254.  Mitchell is in the custody of the Ohio Department of

Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Mitchell*,

Mahoning County Court of Common Pleas Case No. 12 CR 1233.  For the following reasons, the

undersigned recommends the Petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

---

[1]     The Court acknowledges Chrisopher LaRose is current warden of the Northeast
Correctional Center, where Mitchell is currently incarcerated.  (Doc. No. 5 at 1.)

of a state court, factual determinations made by state courts are presumed correct unless rebutted

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Mitchell's conviction as follows:

> {¶ 2} Around noon on October 17, 2012, Mark Haskins was shot four times near
> the corner of Bissell and Kensington Avenues on the north side of Youngstown.
> He died three days later. Just prior to the shooting, the victim called 911. Before
> the dispatcher spoke, the victim could be heard refusing to get in someone's car.
> He then reported to the dispatcher that "somebody jumped on" him at the corner
> of Kensington and Bissell. Another man could be heard yelling in the background
> to which the victim responded, "I didn't steal nothing." The man in the
> background replied by yelling something about "falsifying" and "we want to
> report a robbery." The call then disconnected.

> {¶ 3} Minutes later, a witness heard multiple gunshots as she was raking leaves.
> She turned in time to see the victim fall from a large rock onto the sidewalk in
> front of a nearby house. The shooter fired two to three more times as the victim
> rolled from the sidewalk to the grass. (Tr. 285). The shooter turned to leave but
> then turned back and fired one last shot at the victim. (Tr. 286). The witness
> estimated 7–9 shots were fired. (Tr. 285, 289). One of the bullets passed over her
> head and hit her house. (Tr. 294). She said the shooter looked at her before he got
> into the driver's side of a green vehicle parked at the scene. (Tr. 297).

> {¶ 4} While the witness ran inside to call 911, the victim called 911 a second
> time; he can be heard moaning on the recording. (Tr. 288, 522). A different
> woman, who was also out raking leaves, called 911 and reported seeing a gold
> SUV speed down the street after hearing the gunshots. (Tr. 526). This woman had
> difficulty with colors due to recent brain surgery. (Tr. 527). Another woman was
> driving by when she heard gunfire, which prompted her to stop her car and duck.
> After the shooting, she spotted the victim on the ground and saw a man enter a
> large green truck and drive away from the scene. (Tr. 431–432).

> {¶ 5} While emergency medical personnel treated the victim, he became briefly
> responsive. (Tr. 517, 640, 642). A police officer asked about the shooter and the
> vehicle. The victim described the vehicle as a green truck. (Tr. 640, 650). The
> victim could not or would not report who shot him; the officer's report stated that
> the victim said he did not know who shot him, but the officer testified at trial the
> victim would not provide a name and answered "no" when asked who shot him.
> (Tr. 641642, 648–649).

2

{¶ 6} Police collected eight .40 caliber shell casings from the scene. (Tr. 390). Testing established that they were all fired from the same firearm. (Tr. 475). A slug was recovered from the siding on the witness's house. (Tr. 392). Bullet strikes could be seen on the rock and the sidewalk.

{¶ 7} The main witness was transported to the police station to be interviewed by Detective Martin. She testified at trial, and her October 17, 2012 video statement was played to the jury. She called the shooter's green vehicle a truck but also described it as a SUV, which she said was similar to a Jeep SUV she saw parked at the police station. (Tr. 287). She believed the shooter's vehicle had silver and black molding running down the doors. (Tr. 306–307). On the topic of colors, she said she had no problem discerning the color green but had difficulty distinguishing between black and dark blue and between gray and silver. (Tr. 307-308).

{¶ 8} After the victim died, Detective Martin went to the victim's residence and spoke to his girlfriend, who testified at trial. She disclosed that their neighbor, who lived three doors down, owned a large green SUV. (Tr. 442, 448, 529). The neighbor's nickname was "Smoke." (Tr. 439). At trial, the victim's girlfriend identified Appellant as the neighbor who was the subject of her statement. The victim performed house and car repairs for Appellant in the weeks prior to his death. (Tr. 439). The victim's girlfriend showed the detective her caller identification displaying the various calls Appellant made to their house. (Tr. 443). In addition, she reported Appellant came to their house five to six times in one night looking for the victim and seemed upset. (Tr. 439–440). She said this was "strange" and made her nervous. (Tr. 439). The victim also seemed unusually nervous in the weeks leading up to his death. (Tr. 440–441).

{¶ 9} On November 5, 2012, the eyewitness to the shooting came to the station to view a photo line-up and to add to her statement, the video of which was played to the jury. (Tr. 342, 348–349). The witness reported that she remembered seeing a gray car on the opposite side the street and believed the shooter may have spoken to the person in the gray car before driving away. (Tr. 336–337, 360). She was then administered a photo line-up at the police department by a "blind administrator." Appellant's photograph occupied folder number seven in the first array. (Tr. 535). On her second viewing of the first array, the witness said number three looked like the shooter. She also voiced that number seven looked like the shooter and started crying. (Tr. 373–374, 457). Pursuant to policy, she was not permitted to view the array a third time as she requested. In viewing the second array, she expressed that number one reminded her of number three from the prior array.

{¶ 10} She did not identify the shooter to the administrator; at trial, she explained she thought she was supposed to voice her suspicions to Detective Martin. (Tr.

370). Upon exiting the room, the eyewitness spoke to Detective Martin and informed him that seeing number seven brought it all back, stating she was 99% sure he was the shooter. (Tr. 350, 357– 358, 370, 536). She similarly advised the deputy sheriff who drove her home; this officer was her landlord. (Tr. 321, 540). At trial, she identified Appellant as the shooter (and as number seven in the array). (Tr. 296).

{¶ 11} The police watched Appellant's residence and eventually spotted a green Chevrolet Avalanche, which Appellant later acknowledged was exclusively driven by him. (Tr. 529, 545). As the state pointed out in closing, the photographs show the vehicle is an unusual style of truck. (Tr. 673). It is a four-door pick-up truck, but the back of the cab protrudes toward the bed at an angle with a triangular cut-out behind the back passenger windows, making it appear as if a third row is behind the second row of seats. Detective Martin noted the truck had a gray strip of molding down the side and a silver strip in the front. (Tr. 613). When the photographs were shown to the eyewitness, she did not recall the bed on the vehicle but said it was the same style. (Tr. 585, 595). Notably, the victim's girlfriend, who knows Appellant and is his neighbor, also described the vehicle as an SUV.

*State v. Mitchell*, 62 N.E.3d 820, 826-828 (Ohio App. 7th Dist. Mar. 30, 2016).

## II. Procedural History

### A.    Trial Court Proceedings

In November 2012, a Mahoning County Grand Jury charged Mitchell with one count of aggravated murder in violation of Ohio Rev. Code ("ORC") §2903.01(A)(F), with a firearm specification.  (Doc. No. 5-1, Exh. 1.)  Mitchell pled not guilty.  (Doc. No. 5-1, Exh. 2.)  A December 2012 superceding indictment charged Mitchell with aggravated murder in violation of Ohio Rev. Code §2903.01(A)(F), with a firearm specification (Count One); and having a weapon under disability in violation of ORC 2923.13(A)(3)(B) (Count Two).  (Doc. No. 5-1, Exh. 3.)  Mitchell pled not guilty to this superceding indictment.  (Doc. No. 5-1, Exh. 4.)  He waived his right to a jury trial as to Count Two.  (Doc. No. 5-1, Exh. 5.)

Jury trial commenced on August 18, 2014.  (Doc. No. 5-1, Exh. 6.)  Pursuant to Ohio

4

Crim. R. 29, Mitchell made oral motions for acquittal at the close of the State's case and after the

defense rested.  (*Id*.)  The trial court denied both motions.  (*Id*.)

On August 22, 2014, the jury found Mitchell guilty of aggravated murder and the firearm

specification (Count One).  (*Id*.)  The trial court found Mitchell guilty of having weapons while

under a disability (Count Two).  (Doc. No. 5-1, Exh 7.)  The trial court conducted a sentencing

hearing on August 22, 2014, at which time Mitchell was sentenced to life without parole for the

aggravated murder change, three years for the firearm specification, and three years for the

weapons under a disability charge.  (Doc. No. 5-1, Exh. 8.)  The trial court ordered the sentences

for all convictions to be served consecutively.  (*Id*.)

**B.     Direct Appeal**

On August 25, 2014, Petitioner, through counsel, filed a Notice of Appeal with the Court

of Appeals for the Seventh Appellate District ("state appellate court").  (Doc. No. 5-1, Exh. 9.)

In his appellate brief, Mitchell raised the following assignments of error:

> I.     The trial court erred when it excused a juror after the State offered a
> facially discriminatory explanation for the use of its peremptory
> challenge.  Fifth and Fourteenth Amendments, United States
> Constitution; Article I, Section 2, Ohio Constitution; *Batson v.*
> *Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

> II.    The trial court's decision to excuse a black juror after a *Batson*
> challenge is clearly erroneous when it fails to make the necessary
> *Batson* findings and instead relies upon impermissible factors. Fifth and
> Fourteenth Amendments, United States Constitution; Article I, Section
> 2, Ohio Constitution; *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712,
> 90 L.Ed.2d 69 (1986).

> III.   The trial court erred in denying a mistrial when the jury repeatedly
> heard inadmissible testimony regarding threats to witnesses; and, as a
> result, deprived Mr. Mitchell of a fair trial.  Ohio Evid.R. 404(B); Fifth
> and Fourteenth Amendments to the United States Constitution; Article I,
> Section 16 of the Ohio Constitution.

5

IV.     Mr. Mitchell was denied his right to confront the evidence against him at trial, in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

V.      Mr. Mitchell was denied the effective assistance of counsel when defense counsel (1) asked about the "suspect" in the second line-up when the second line-up pertained to the investigation of threats made against the sole eyewitness, (2) failed to move for a mistrial when Detective Martin offered hearsay evidence from a non-testifying witness to link Mr. Mitchell to the crime, and (3) failed to object to the State's use of testimonial "double hearsay" evidence for the trust of the matter asserted during closing arguments.  Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; *Strickland v. Washington*, 466 U.S. 668, 687 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); R.C. 2941.25.

(Doc. No. 5-1, Exh. 11.)  The State filed a brief in response, to which Mitchell replied.  (Doc. No. 5-1, Exh. 12, 13.)

On March 30, 2016, the state appellate court affirmed Mitchell's convictions and prison sentences.  (Doc. No. 5-1, Exh. 14.)

On May 12, 2016, Mitchell, through counsel, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No.5-1, Exh. 15.)  In his Memorandum in Support of Jurisdiction, Mitchell raised the following Propositions of Law:

I.      When the State's proffered reason for striking a juror is an unsubstantiated presumption based in whole or in part on race, this is not race-neutral for purposes of Batson.  Fifth and Fourteenth Amendments, United States Constitution; Article I, Section 2, Ohio Constitution; *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); R.C. 2941.25/

II.     A trial court may not excuse an African American juror after a *Batson* challenge until it makes the necessary *Batson* findings and may not rely upon impermissible factors.  Fifth and Fourteenth Amendments, United States Constitution; Article I, Section 2, Ohio Constitution; *Batson v. United States*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

6

> III.    In ascertaining whether a violation of the Confrontation Clause is
> harmless beyond a reasonable doubt, the standard of review must ask
> whether the error substantially influenced the jury's decision and may
> not merely inquire whether there was enough evidence to support the
> result.  Fifth, Sixth, and Fourteenth Amendment rights under the United
> States Constitution, and Sections 10 and 16, Article I of the Ohio
> Constitution; R.C. 2941.25.

(Doc. No. 5-1, Exh. 16.)  The State did not file a response.  (Doc. No. 5-1, Exh. 17.)

On August 31, 2016, the Supreme Court of Ohio declined to accept jurisdiction of the

appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 5-1, Exh. 18.)

**C.     Post-Conviction Filings**

On August 25, 2014, Mitchell, through counsel, filed a Request for a New Trial with the

state trial court.  (Doc. No. 5-1, Exh. 19.)  This filing requested a new trial based upon the

following:

> I.     The verdict was against the manifest weight of the evidence.
>
> II.    The jury was permitted to hear threats allegedly made, over
> objection.  Given the questions asked during deliberation, the jury
> was clearly influenced by this inadmissable testimony.
>
> III.    The testimony of the sole witness to identify the Defendant was only
> made in the courtroom at trial and is inherently unreliable.
>
> IV.    The jury was permitted to hear of a "photo line-up" identification
> which was clearly prejudicial to the Defendant.

 (Doc. No. 5-1, Exh. 19.)  The State filed a response in opposition.  (Doc. No. 5-1,

Exh. 20.)

On September 22, 2014, the trial court overruled Defendant's request for a new trial.

(Doc. No. 5-1, Exh. 21.)

**D.    Federal Habeas Petition**

On August 17, 2017, Mitchell, through counsel, filed a Petition for Writ of Habeas

Corpus in this Court and asserted the following grounds for relief:

> **GROUND ONE**: The Mahoning County, Ohio, Court of Appeals unreasonably
> and contrarily applied *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90
> L.Ed.2d 69 (1986) when it ruled that Mr. Mitchell's right to equal protection was
> not violated by the exclusion of Christopher Whitfield from his jury.
>
> **GROUND TWO**: The Mahoning County, Ohio, Court of Appeals unreasonably
> and contrarily applied *O'Neal v. McAnnich*, 513 U.S. 432, 115 S.Ct. 992, 130
> L.Ed.2d 947 (1995) when it ruled a *Crawford* violation was harmless by
> evaluating the weight of the evidence against Mr. Mitchell after having excised
> testimonial hearsay.

(Doc. No. 1.)

On November 30, 2017, Warden Christopher LaRose ("Respondent") filed his Return of

Writ.  (Doc. No. 5.)  Mitchell filed a Traverse on December 18, 2017.  (Doc. No. 7.)

### III.  Review on the Merits

**A.    Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable

8

determination of the facts in light of the evidence presented in the State
court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49.  *See also Lopez v. Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  *See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court

9

decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411. Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law. *Id.* at 410-12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

## 1. Ground One – *Batson v. Kentucky*

In his first ground for relief, Mitchell asserts the state appellate court improperly applied

10

the standards set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986) when it found his "right to equal protection was not violated by the exclusion of Christopher Whitfield from his jury." (Doc. No. 7 at 8.) Mitchell contends the state appellate court "failed to hold the trial court accountable to the three-step process required by *Batson*," as the state trial court "did not make any factual findings related to purposeful discrimination to which the appellate court could grant deference" (*Id*.) Instead, Mitchell argues, "the factual finding was invented by the appellate court" which therefore "relieved the trial court of its obligation to evaluate whether or not the prosecutor's facially race neutral explanation for its peremptory was pretextual." (*Id*. at 11.)

Respondent maintains the state appellate court's "rejection of Mitchell's *Batson* challenge is both reasonable and in full accord with Supreme Court precedent." (Doc. No. 5 at 19.) Respondent asserts "[i]n light of the absence of evidence that the prosecutor was motivated by a racially-discriminatory purpose in removing this juror, and because the prosecutor's logical and race-neutral explanation was provided in the record, and accepted by the court that was in the best position to evaluate said rationale, the appellate court reasonably denied Mitchell's *Batson* challenge." (*Id*. at 20-21.)

The Equal Protection Clause of the Fourteenth Amendment commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The Supreme Court long has held that the Equal Protection Clause prohibits states from trying a defendant before a jury from which members of his race purposefully have been excluded. *See, e.g.*, *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). The Court extended this principle in *Batson v. Kentucky*, 476 U.S. 79 (1986), in which it ruled that the Equal Protection Clause precludes a party from using a peremptory challenge to exclude

11

members of the jury venire on account of their race.  *Batson*, *supra*, 476 U.S. at 89.  It explained that "harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community.  [Such procedures] undermine public confidence in the fairness of our system of justice."  *Id* at 87.  *See also Miller-El v. Dretke*, 545 U.S. 231, 235 (2005) ("When the government's choice of jurors is tainted with racial bias, that 'overt wrong . . . casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial.'") (quoting *Powers v. Ohio*, 499 U.S. 400, 412 (1991)).

In *Batson*, the Supreme Court articulated a three-step process for evaluating claims when a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. *Id*. at 96-98.  First, the court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Id.* at 96-97. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  *Id.* at 97-98.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).  Indeed, "[t]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989).

Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, *supra*, 476 U.S. at 98.  "This final step involves

12

evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"  *Rice*, *supra*, 546 U.S. at 338 (quoting *Purkett*, *supra*, 514 U.S. at 768).  In making this determination, the Sixth Circuit has observed, "the court presumes that the facially valid reasons proffered by the [party exercising the peremptory challenge] are true."  *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (quoting *Lancaster v. Adams*, 324 F.3d 423, 433 (6th Cir. 2003)).  The issue, therefore, "comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible."  *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).  "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'"  *Id*.

The Supreme Court has emphasized that trial-court findings on the issue of discriminatory intent must be afforded "great deference."  *See Hernandez v. New York*, 500 U.S. 352, 364-66 (1991).  This makes "particular" sense, it has explained, because

> [t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.  As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id*. at 365 (quoting *Witt, supra*, 469 U.S. at 428).  In fact, "[t]he credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review."  *Id*. at 367.  Thus, the state court's determination of whether the prosecutor intended to discriminate is a "question of historical fact," which is  presumed correct unless rebutted by clear and convincing evidence.  *Lancaster v. Adams,* 324 F.3d 426, 429 (6th. Cir. 2003) (citing *Hernandez*, 500 U.S. at 367.).

13

Here, Mitchell raised a *Batson* claim on direct appeal to both the state appellate court and the Supreme Court of Ohio. (Doc. No. 5-1, Exh. 11, 16.) The state appellate court considered this claim on direct review and rejected it as follows:

{¶ 14} Appellant's first two assignments of error, which concern one peremptory challenge utilized by the state, provide:

"The trial court erred when it excused a juror after the State offered a facially discriminatory explanation for the use of its peremptory challenge."

"The trial court's decision to excuse a black juror after a *Batson* challenge is clearly erroneous when it fails to make the necessary *Batson* findings and instead relies upon impermissible factors." (Citations omitted.)

{¶ 15} The state used its third peremptory challenge on prospective juror number 7, Mr. Whitfield. (Tr. 178). An unrecorded sidebar was held after which an in chambers discussion was recorded. (Tr. 178–179). Defense counsel noted this was the second minority juror excused by the state. He stipulated "there are two remaining minority jurors in this case" and noted other minority members of the upcoming panel would likely not be reached. Counsel voiced a *Batson* objection asking the court to determine whether there existed a race neutral reason for the peremptory challenge. (Tr. 179). The assistant prosecutor responded:

> * * * Whitfield, his last name, we have prosecuted many Whitfields. He's from the south side as well. So even though he didn't indicate he had any family members that were prosecuted by us or who had convictions, I'm afraid that this Mr. Whitfield is related not only to Reginald Whitfield, who we just had a case with in Judge Durkin's court, but many of the other Whitfields who we have prosecuted. They are all from the south side. (Tr. 180).

{¶ 16} Defense counsel responded that the state could have asked this of the juror in voir dire and still could do so, opining it would not be offensive. (Tr. 180). At this point, the assistant prosecutor pointed out there were still three or four more minorities in the back of the courtroom. (Tr. 180). Defense counsel reiterated his belief that they would not reach those panel members. A different assistant prosecutor then commented that the defendant and the victim were both African–American, as opposed to a white victim. Defense counsel protested that the issue of whether there is an African–American victim is not the point of the Supreme Court law on the subject. (Tr. 181). The court overruled the objection and allowed the state's peremptory

14

challenge to stand.

{¶ 17} Being an Equal Protection clause argument, the burden is on the defendant to prove the state racially discriminated in the use of a peremptory challenge. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The process entails three steps: (1) the defendant's prima facie case of racial discrimination; (2) the state's obligation to set forth a race-neutral reason; and (3) the trial court's judgment as to whether the prosecutor purposefully discriminated. *See id.* at 97–98, 106 S.Ct. 1712.

{¶ 18} First, the defendant must object to the peremptory challenge and set forth a prima facie case of racial discrimination by pointing to relevant circumstances that raise an inference the prosecutor used the challenge to exclude the prospective juror on account of his race, which could include: the state's use of a prior challenge against the same race; the defendant and the challenged juror are members of the same racially cognizable group; and/or disparate questions were asked in voir dire. *Id.* at 96–97, 106 S.Ct. 1712. *See also Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (racial identity between the defendant and the excused juror may make it easier to establish the case, but race is irrelevant to a defendant's standing to assert discrimination against a juror). This preliminary issue of whether the defendant made a prima facie showing becomes moot, however, if the state offers a race-neutral explanation for the peremptory challenge and the trial court rules on the ultimate question of intentional discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶ 19} Under the second step, the state must provide a racially neutral explanation for the challenge. *Id*. A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.*

{¶ 20} Third, if the state provides a race-neutral explanation, the trial court must view all the circumstances and determine whether there was purposeful discrimination, i.e. whether the explanation is merely pretextual. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. Although this step entails evaluating the persuasiveness of the state's explanation, the burden of persuasion regarding racial motivation remains on the defendant. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006); *State v. Gowdy*, 88 Ohio St.3d 387, 393, 727 N.E.2d 579 (2000) ( "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."). We do not reverse a trial court's decision on intentional

15

discrimination unless it was clearly erroneous. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 64; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106, 110 (defer to the trial court's credibility decision).

{¶ 21} Appellant contends an evaluation of his prima facie case is moot since the state provided an explanation upon which the court ruled. *See State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999) ("Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot."), citing *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. The state agrees and proceeds to address Appellant's next contention.

{¶ 22} Appellant alleges the reason provided by the state is facially invalid rather than racially neutral. He argues the trial court would never reach the third step where the credibility of the prosecutor making the statement is evaluated. Appellant asserts the state voiced race was a consideration when it assumed African–Americans with the last name of Whitfield who live on the same side of town are related. He believes the state's explanation carries a presumption that race, neighborhood, and last name define the prospective juror as fitting in an undesirable category.

{¶ 23} Appellant presents various arguments which appear more related to an argument of intentional discrimination under the third step than an argument that the reason was not race-neutral. For instance, Appellant urges that the state's failure to conduct voir dire on the subject of relatives is evidence suggesting the explanation is a pretext for discrimination. He also argues the state's explanation was based upon an unsupported assumption or fear that the juror was related to criminals due to his last name and neighborhood. He urges the state did not explain why being related (by an unknown degree of relationship) to a criminal would be problematic.

{¶ 24} "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. The explanation is not unconstitutional solely because it results in a racially disproportionate impact. *Id.* at 359–360, 111 S.Ct. 1859. Discriminatory purpose implies the prosecutor exercised the challenge "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 360, 111 S.Ct. 1859 (awareness of consequences does not equate with discriminatory intent).

{¶ 25} The state's explanation for the peremptory challenge must merely be

16

based on something other than the race of the juror. *Id.* at 360, 111 S.Ct. 1859. It need not rise to the level of a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. 1712. In this step, the state's explanation need not be "persuasive, or even plausible" as long as the reason is not inherently discriminatory. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). In fact, the state's reason can be silly or superstitious as long as it is not race-related; the persuasiveness of the explanation does not arise until the third step. *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (long unkempt hair and facial hair is race neutral). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859.

{¶ 26} Notably, the court asked the panel whether any of their family members have ever been charged or arrested. (Tr. 52). This question prompted no disclosure by juror number 7. A concern that a prospective juror is related to various individuals prosecuted by that same prosecutor's office, including one recent conviction cited by name to the court, is not racially discriminatory. In addition, there is the concern, expressed by the state, that a juror did not mention prosecuted family members when asked.

{¶ 27} "Removing a juror based on the past criminal history of him or her, or his or her family member, is a valid, race-neutral reason for raising a peremptory challenge." *State v. Lacey,* 7th Dist. No. 10MA122, 2012-Ohio-1685, 2012 WL 1306448, ¶ 127, quoting *State v. Santiago*, 10th Dist. No. 02AP–1094, 2003-Ohio-2877, 2003 WL 21291025, ¶ 10. *See also State v. Coleman*, 85 Ohio St.3d 129, 142, 707 N.E.2d 476 (1999) (prior involvement with drug trafficking by family member of prospective juror is a race-neutral explanation under step two that trial court could find credible under step three); *State v. May*, 8th Dist. No. 102482, 2015-Ohio-4275, 2015 WL 5997554, ¶ 51 ("the potential bias that may result from a prospective juror's or his or her family's experiences with the criminal justice system may be a legitimate, racially neutral reason for exercising a peremptory strike against the prospective juror"); *State v. Reed*, 6th Dist. No. L–97–1133, 1998 WL 336317 (June 12, 1998) (excused jurors had relatives who had been convicted of crimes).

{¶ 28} The skin color of the Whitfield named by the state (as an example of a recent prosecution by this prosecutor's office) was not mentioned; nor was the skin color of any of the other prosecuted Whitfields mentioned. Appellant cites us to an offender search of the website of the Ohio Department of Rehabilitation and Corrections to establish that the most recently prosecuted Whitfield named by the state was African–American. *See* Appellant's Brief at 19, fn.4. This is evidence outside the trial record.

17

{¶ 29} Regardless, skin color does not eliminate the possibility of familial relationship with another by affinity or consanguinity. There is no indication in the explanation that the state would not have exercised the challenge if juror number 7 was a Whitfield from the south side of town who appeared to be white. An explanation is not unconstitutional on its face solely because it results in a racially disproportionate impact. *Hernandez,* 500 U.S. at 359–360, 111 S.Ct. 1859. Whether the state's concern was genuine versus pretextual involves the third step, and we will consider Appellant's arguments relating to this subject under the discussion of that step, *infra.*

{¶ 30} In assignment of error number one, Appellant also condemns the prosecution's observation that three or four more African–Americans remained for potential seating on the jury and that the case involved a victim and a defendant of the same race. These are not race-neutral reasons for excluding juror number 7. *See, e.g., State v. Gowdy*, 88 Ohio St.3d 387, 393, 727 N.E.2d 579 (2000) (as the Fourteenth Amendment protects the juror from discrimination, the fact that another juror of the same race remained on the jury does not preclude a holding that the state unlawfully removed a juror).

{¶ 31} However, the mere making of such observations after providing race-neutral reasons does not result in a finding that the state failed to set forth a race-neutral reason under step two of the analysis. *See Gowdy*, 88 Ohio St.3d at 393, 727 N.E.2d 579 (the Court continued to address the other explanations provided by the state). Notably, the state's observations were made after defense counsel predicted the remaining voir dire would not reach the other African–Americans on the venire, which would leave only two minorities on the jury. Likewise, defense counsel pointed out this was the second excused minority juror. (Tr. 179). Moreover, the effect of the state's challenges is a factor that can be considered in determining pretext under the third step in the analysis. *See Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). *See also Batson*, 476 U.S. at 97, 106 S.Ct. 1712 (the defendant can also use the number of challenges to minorities to bolster his prima facie case).

{¶ 32} Related to this argument, Appellant's second assignment of error claims the court considered impermissible factors. After allowing the state to excuse juror number 7, the judge stated: "And the court does acknowledge that there are blacks sitting in—waiting in the back that are available. And Mr. Whitfield was not the only minority on this jury." (Tr. 182). Again, defense counsel first brought up the fact that only two minorities would remain on the jury without juror number 7 and predicted he would not reach the other minorities in the back of the courtroom during voir dire. (Tr. 179). Additionally, because the effect of the challenge is a circumstance a court

can consider in evaluating the issue of pretext, the mere acknowledgement of the composition of the present jury and venire would not constitute an error. *See generally Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317; *Batson,* 476 U.S. at 97, 106 S.Ct. 1712.

{¶ 33} Appellant's second assignment of error also claims the trial court erred in failing to make the "necessary Batson findings." When presented with such an argument, the Ohio Supreme Court has stated: "Certainly, more thorough findings by the trial court in denying the defense *Batson* objections would have been helpful. However, the trial court is not compelled to make detailed factual findings to comply with *Batson*." *State v. Frazier*, 115 Ohio St.3d 139, 152, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 98.

{¶ 34} After providing the parties a reasonable opportunity to make their respective records, the trial court's ruling on the credibility of a proffered race-neutral explanation can merely be expressed in the form of a clear rejection or acceptance of a *Batson* objection. *Id. See also Gowdy*, 88 Ohio St.3d at 393, 395, 727 N.E.2d 579 (where the defendant claimed the trial court did not proceed to step three of the inquiry and instead stopped after determining the reasons advanced by the prosecutor were race-neutral). Here, the trial court clearly rejected the *Batson* objection, which was sufficient to express its ruling.

{¶ 35} We proceed to address the final question concerning whether the trial court could rule that the defendant did not meet his burden of showing the prosecution's concern was mere pretext. Appellant points out the failure to conduct voir dire on the subject is evidence suggesting the explanation is a sham or pretext for discrimination. *Citing Miller–El v. Dretke*, 545 U.S. at 246, 125 S.Ct. 2317 (quoting an Alabama case via parenthetical). The Court made this statement in assessing the implausibility of the state's explanation involving the criminal conviction of a prospective juror's brother; the Court emphasized that the explanation was only proffered after the state's initial reason was shown to be an improper characterization of the juror's responses to questions on the death penalty. *Id. See also id.* at fn. 8 (other jurors had relatives convicted of crimes who were not struck).

{¶ 36} The *Miller–El v. Dretke* case was a capital case tried prior to *Batson* and remanded by a state appellate court to the trial court for consideration of *Batson*, which hearing elicited additional facts concerning the state's discriminatory practices in voir dire, including: out of 20 black members of a 108–person venire panel only 1 served; 10 blacks were peremptorily struck by the state, which excluded 91% of the eligible black venire members; side-by-side comparisons of black panelists and white panelists allowed to serve suggested bias; disparate questioning of the races occurred; the state

19

used a manual with reasoning for excluding minorities; and, the state employed a Texas "jury shuffling" practice when blacks moved to the forefront of the venire. *See id.* at 240–241, 253, 125 S.Ct. 2317 (reviewing statistics and other "clues" as to the prosecution's intentions, in addition to the peremptory challenges themselves).

{¶ 37} As can be seen, the *Miller–El v. Dretke* case contained many circumstances that distinguish it from the case at bar. For instance, we have the statement that this juror was the second minority juror excused, but we do not have extreme statistics. Nor do we have the situation where "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve * * *." *See Miller–El*, 545 U.S. at 241, 125 S.Ct. 2317. There was no indication that any non-black juror may have had a family member who had been recently convicted by this prosecutor's office (or at all).

{¶ 38} Appellant counters that there is no indication juror number 7 had such a family member either. The fact that the state did not specifically inquire of juror number 7 as to whether he was related to various Whitfields is a factor to consider in evaluating whether there was purposeful discrimination. However, it is not dispositive. The statement in *Miller–El,* 545 U.S. at 246, 125 S.Ct. 2317, that a failure to inquire is suggestive of pretext, was not a holding that a failure to inquire per se establishes pretext. The jury questionnaire and the court asked about family members who were charged or arrested, and this juror did not make a disclosure. Still, the prosecution was concerned. The court must "assess the plausibility of" the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller–El v. Dretke*, 545 U.S. at 252, 125 S.Ct. 2317.

{¶ 39} The trial court was to ascertain whether the prosecutor's concern was genuine. The prosecutor's office recently prosecuted a Reginald Whitfield. Besides providing a specific defendant's name, the state pointed to the trial judge who presided over that defendant's case. This prosecutor's office also prosecuted "many of the other Whitfields," all of whom live on the south side of town where this juror lived, which caused her to be "afraid" the juror was related to the prosecuted Whitfields. (Tr. 180). As aforementioned, having relatives that were convicted of crimes is a valid concern of the prosecution about a prospective juror. *See, e.g., Coleman*, 85 Ohio St.3d at 142, 707 N.E.2d 476 (1999). The concern is greater where the relatives were recently prosecuted by this prosecutor's office. A trial court may believe a prosecutor's expression of concern when evaluating whether the state engaged in purposeful discrimination.

{¶ 40} Appellant replies that the concern is unfounded as to this juror

20

because the existence of a familial relationship is based upon an assumption unsupported by the record. The state counters that the record suggests a strong likelihood the juror was related to individuals prosecuted by that prosecutor's office.

{¶ 41} In *Rice*, the state exercised a peremptory challenge against an African–American female based on a fear that a young single citizen with no ties to the community might be too tolerant of the crime at issue, even though the juror's answers in voir dire did not support such a belief. The United States Supreme Court held that pretext is not established merely because the prosecutor claimed to hold such concerns despite the juror's voir dire averments. *Rice*, 546 U.S. at 341, 126 S.Ct. 969. The Court found it was not unreasonable to believe the prosecutor remained worried about the juror even if the prosecutor could be seen as overly cautious. *Id.* (reversing the Ninth Circuit's decision to reverse state court decisions on the matter).

{¶ 42} The trial court's decision is partially based upon the prosecutor's demeanor in explaining her position; whether the prosecutor's explanation is genuine is a credibility determination subject to great deference. *Davis v. Ayala*, ––– U.S. ––––, 135 S.Ct. 2187, 2199, 2201, 192 L.Ed.2d 323 (2015) (adding: "Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation."). Moreover, our standard of review is whether the trial court was "clearly erroneous" in accepting the state's explanation as genuine as opposed to a pretext for purposeful discrimination. *Id.* at 2199; *Frazier*, 115 Ohio St.3d 139, 873 N.E.2d 1263, at ¶ 64. Although other judges could disagree with this trial judge's decision that the prosecutor's assessment was plausible, "a trial judge may choose to disbelieve a silly or superstitious reason"; "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (Emphasis added.) *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 (reversing the appellate court's decision that long unkempt hair and facial hair is not a race-neutral reason and remanding for the appellate court to review the trial court's third stage decision on whether the prosecutor's explanation was genuine).

{¶ 43} This court finds the trial court was not clearly erroneous by believing the prosecution did not purposefully discriminate when it asked to excuse juror number 7. Whitfield is not a noticeably common surname like Jones or Smith. The prosecutor's office was involved in investigating and prosecuting many Whitfields from the same area of town as the juror. The prosecutor's lingering concerns, notwithstanding the juror's failure to report a relative's arrest, does not so lack plausibility that the trial court's decision should be rendered clearly erroneous. For all of these reasons, the first and second assignments of error are overruled.

21

*Mitchell,* 62 N.E.3d at 828-834.

The Court finds the state appellate court's determination was neither contrary to nor an unreasonable application of clearly established federal law.  As the state appellate court correctly noted, the State excused prospective juror Whitfield with their third peremptory challenge during voir dire.  (Doc. No. 6-2, Tr. 70.)  Mitchell's trial counsel subsequently made a *Batson* challenge, noting prospective juror Whitfield was the "second minority juror excused by the state of Ohio."  (Doc. No. 6-2,. Tr. 71.)

The State provided the following explanation for excluding prospective juror Whitfield:

> Your Honor, this one Christopher Whitfield, his last name, we have prosecuted many Whitfields.  He's from the south side as well.  So even though he didn't indicate that he had any family members that were prosecuted by us or had convictions, I'm afraid that this Mr. Whitfield is related not only to Reginald Whitfield, who we just had a case with in Judge Durkin's court, but many of the other Whitfields who we have prosecuted. They are all from the south side.

(*Id.* at Tr. 72.)  The State, Mitchell's trial counsel, and the state trial court then engaged in the following discussion:

| | |
|---|---|
| DEFENSE: | And I'm of the belief they could have asked that in voir dire. That's not offensive to anyone.  And it was not asked.  And even if they wanted to ask it now, I would have no objection to that. |
| STATE: | Your Honor, and there's more than two left in the back of the courtroom as well.  There's at least three or four in the back of the courtroom. |
| COURT: | Minorities? |
| STATE: | Yes. |
| STATE: | And also, Judge — |
| DEFENSE: | But we are not going to get to them.  Go ahead. |

| STATE: | I would want to make it clear as well that we do, in this case, have an African American defendant and also an African American victim here. We don't have a white victim. |
|---|---|
| DEFENSE: | That – with no offense to Attorney McLaughlin, who I absolutely respect.  That kind of an excuse – I don't want to call it an excuse – reasoning for getting rid of somebody long went out the window. |
| STATE: | No, that's – I'm sorry, go ahead. |
| DEFENSE: | The issue of it being an African American victim is not the point of the Supreme Court.  The Supreme Court's point is the relationship and the fairness of the jury composition to the person being judged. |
| COURT | Anything else? |
| STATE: | No, Your Honor. |
| COURT: | All right.  Well, the court does find that the – I'm going to allow the excuse of him.  And the court does acknowledge that there are other blacks sitting in – waiting in the back that are available.  And Mr. Whitfield was not the only minority on this jury.  So we will overrule that. |

(*Id.* at 72-74.)

Mitchell argues the state trial court addressed the *Batson* challenge in too cursory a

fashion, contending the state appellate court "invented" the factual findings the state trial court

was required to make.  (Doc. No. 7 at 11.)  The Court disagrees and finds the state trial court

adhered to *Batson's* three-step burden-shifting framework.  The state provided[2] a race neutral

---

2        Neither party addresses the first step under *Batson* analysis - the defendant's burden
         to show a *prima face* case of discrimination.  Regardless, "once a prosecutor has
         offered a race-neutral explanation of the peremptory challenges and the trial court
         has ruled on the ultimate question of intentional discrimination, the preliminary issue
         of whether the defendant has made a *prima facie* showing becomes moot."
         *Hernandez,* 500 U.S. at 359.  *See also Lancaster,* 324 F.3d at 434-35.

reason for striking prospective juror Whitfield, namely, his possible relation to several individuals who had been prosecuted by Mahoning County.  After considering this explanation, the state trial court ruled Whitfield was to be excused from the jury.  This is sufficient under *Batson*.  While the state trail court could have explained more fully why the prosecutor's explanation was sufficient, its perfunctory ruling did not violate any clearly established federal law.  *See Caudill v. Conover*, 881 F.3d 454, 459 (6th Cir. 2018)("The Supreme Court has never directed trial courts to make detailed findings or to solicit the defense attorney's views before ruling on a *Batson* motion.").  *See also Purkett*, 514 U.S. at 766, 769–70 (holding that a federal court failed to adequately defer to the state trial court's factual finding of no racial motive, even though the trial court rejected the *Batson* objection "without explanation"); *Braxton*, 561 F.3d at 462 ("In the absence of clearly established Supreme Court authority requiring further elaboration," the state trial court, "albeit in abbreviated fashion, adequately and reasonably conveyed its decision.").

While Mitchell focuses on the trial court's obligation to rule on a *Batson* objection, he fails to acknowledge he continues to "bear the burden of persuasion" even at step three of the *Batson* framework.  *See Braxton*, 561 F.3d at 459; *Akins v. Easterling*, 648 F.3d 380, 387 (6th Cir. 2011).  It is at this third step a defendant "has the opportunity to rebut the proffered race-neutral reason as pretext."  *Akins*, 648 F.3d at 387.  Here, a review of the trial transcript reveals beyond arguing the prosecutor could have inquired more of prospective juror Whitfield and suggesting none of the remaining black members of the venire would be empaneled, Mitchell's counsel did not provide any further argument as to why the prosecutor's reasoning was pretext. Moreover, within his federal habeas petition, Mitchell continues to provide no evidence to show

the prosecutor's reasoning was pretext for discrimination.  While he argues "there was no evidence in the record to support the assertion that Mr. Whitfield was related to criminals," he does not provide any evidence to the contrary.  (Doc. No. 7 at 12, 13.)  *See Purkett*, *supra*, 514 U.S. at 768 (finding while the third step involves evaluating "the persuasiveness of the justification" offered by the prosecutor, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from" the defendant.).

Indeed, the state trial court's finding as to the credibility of the prosecutor's explanation is a factual determination which is presumed correct unless rebutted by clear and convincing evidence.  *Lancaster,* 324 F.3d at 429 (citing *Hernandez,* 500 U.S. at 367.).  The State asserted it struck Mr. Whitfield from the jury due to his possible relation to several individuals who had been prosecuted by Mahoning County.  To support this explanation, the State noted Mr. Whitfield was from the same area of town as the Whitfields who had been prosecuted by Mahoning County.  The State was also able to name with an individual they were particularly concerned was a relation to prospective juror Whitfield.  Mitchell argues this explanation was based upon "assumptions, innuendo, and stereotypes," but offers no "clear and convincing evidence" the prosecutor's race neutral explanation was not credible.  (Doc. No. 7 at 13.)  Because the prosecutor provided a reasonable, race-neutral explanation for Mr. Whitfield's removal, it was within the trial court's discretion to accept this explanation.

Mitchell argues the State's explanation was pretext because the prosecutor did not ask any follow up questions of Mr. Whitfield regarding his relatives' criminal history.  (Doc. No. 7 at 13.)  It is true the failure to "ask follow-up questions can undercut the persuasiveness of the averred concern."  *Russell v. Bunting,* 722 Fed. App'x 539, 548 (6th Cir. Feb. 20, 2018) (citing

*Miller-El v. Dretke,* 545 U.S. 231, 250 n.8 (2005).).  However, the "evaluation of the prosecutor's state of mind based on demeanor and credibility 'lies peculiarly within a trial court's province.'"  *Hernandez,* 500 U.S. at 365 (citing *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  At most, Mitchell may have identified an area where the prosecutor could have been more thorough in conducting voir dire.  He did not, however, provide "clear and convincing evidence" the trial court's determination was erroneous.

Mitchell also emphasizes the state trial court's comments on the remaining African American jurors on the venire.  (Doc. No. 7 at 10-11.)  Mitchell argues "rather than considering whether this statement from the trial court was proper under the *Batson* analysis, the [state appellate court] instead found that the trial court believed 'the prosecution did not purposefully discriminate when it asked to excuse'" prospective juror Whitfield.  (*Id.* at 11.)  However, a review of the state appellate court decision indicates the state appellate court properly analyze Mitchell's *Batson* claim under the three-part inquiry established in *Batson.*  Moreover, the state appellate court specifically evaluated the state trial court's comments regarding the racial makeup of the venire, noting "the effect of the challenge is a circumstance a court can consider in evaluating the issue of pretext, the mere acknowledgment of the composition of the present jury and venire would not constitute an error."  *Mitchell,* 62 N.E.3d at 832.

Moreover, as noted *supra*, it was Mitchell's trial counsel who first asserted any remaining African-American prospective jurors would not be empaneled, in an attempt to argue the prosecutor's reasoning was pretext.  (Doc. No. 6-2 at Tr. 73.)  *See also Mitchell*, 62 N.E.3d at 832.  The state trial court, after allowing for Mr. Whitfield to be struck from the jury, made a comment regarding the racial makeup of the venire and jury in response to Mitchell's trial

counsel argument.  (Doc. No. 6-2 at 74.)  Mitchell points to no clearly established federal law which holds the acknowledgment of a venire's composition, after striking a prospective juror, is an error under *Batson*.  *See also Betts v. Tibbals*, 2014 WL 4794530, *6 (N.D. Ohio Sept. 24, 2014)(denying habeas relief based upon a *Batson* objection where a state appellate court noted an African-American remained on the jury panel).  Overall, Mitchell has failed to establish the state trial court's decision on the *Batson* objection was contrary to, or involved an unreasonable application of, clearly established federal law.

Accordingly, it is recommended Mitchell's First Ground for Relief be denied.

**2.      Ground Two**

In his second ground for relief, Mitchell argues his constitutional right to confrontation was violated when Detective Martin was permitted to testify as to the contents of a tip he received from two of the victim's relatives.  (Doc. No. 7 at 13.)

On direct appeal, the state appellate court considered this claim and rejected it as follows:

{¶ 70} As set forth in the statement of facts, the victim's live-in girlfriend testified: the defendant was her neighbor, who lived three doors down; his nickname was "Smoke;" he drove a green vehicle she called an SUV; the victim did house and car repairs for Appellant in the weeks leading up to the shooting; Appellant appeared upset as he repeatedly came to their house looking for the victim, which was unusual; and the victim seemed nervous as he avoided Appellant. (Tr. 438–442, 444, 448).

{¶ 71} Later, the state questioned the lead detective on the stages of his investigation the day after the shooting, the detective began explaining that two of the victim's relatives told him "that they had heard * * *." Defense counsel objected, and the court sustained the objection. (Tr. 523). The detective then testified that he followed up on a tip received from the victim's relatives. (Tr. 524). After the state asked what he was looking for based on the tip, the following took place:

A Well, the only tip I had was that the individual—

27

[Defense counsel]: Objection.

COURT: You can finish it from who—from an individual, but the extent of the conversation is sustained.

Q Not saying what they said, but based on those tips, who were you looking for?

[Defense counsel]: Objection. That's saying it the same way, Your Honor.

COURT: No, he can answer that.

Q Go ahead.

A For an individual who went by the name of Smoke who drove a green SUV and lived in the neighborhood. (Tr. 524).

The detective then explained how he investigated two other individuals with the nickname of Smoke; he discovered one was incarcerated on the day of the shooting, and he could not connect the other to a green vehicle. (Tr. 525–526).

{¶ 72} Appellant urges the trial court erred in permitting the detective to testify that, based upon a tip, he began looking for a person with the nickname Smoke who drove a green SUV and lived in the neighborhood. Appellant believes the state magnified the error in its closing argument.

{¶ 73} For instance, the state's closing noted the eyewitness reported to the lead detective and a sheriff's deputy that number seven was the shooter and observed: "It just so happens that number seven is Janero Mitchell, number seven is the one who drives a green SUV truck, and number seven is known as Smoke. Same as what [the victim's girlfriend] described." (Tr. 673–674). The state later asked the jury to consider the eyewitness's testimony in light of the all the other evidence, noting it was not just her identification: "It's her identifying someone matches the name Smoke, who drives a green truck and who is having a dispute with the victim. And he admitted to Detective Martin himself, he knew the victim and he's the only one who drives that green truck." (Tr. 676–677).

{¶ 74} Appellant further points to statements in the final closing such as: "[The victim's girlfriend] only gave the starting point. You know what? This Janero Mitchell, this Smoke, he's been calling, he's been calling, they have been stopping, him and Willie D, his friend, they are stopping by, looking for

Mark and Mark keeps ignoring them. And they stop calling after he's shot." (Tr. 710–711). Finally, Appellant believes the state used the tip testimony in the following statement: "She doesn't know that number seven goes by Smoke. She didn't know that number seven and Mark Haskins knew each other. She didn't know that number seven is going to be the one with the green truck. It's not a coincidence. She doesn't know that he lived three houses away from each other." (Tr. 713).

{¶ 75} Appellant believes these were all references to the testimony about the content of the tip. However, the state's point in closing was that this is not merely a case of an eyewitness identification of a stranger; rather, the case has additional corroborating factors. For example, the eyewitness picked out a person who was the victim's neighbor; the eyewitness described a green SUV as the vehicle the shooter drove away from the scene; the victim's girlfriend reported their neighbor "Smoke" had been looking for the victim in an upset manner and he drove a green SUV; and a green Chevy Avalanche was admitted to be the vehicle exclusively driven by Appellant.

{¶ 76} Therefore, even if the admission of the contents of the tip was erroneous, these closing arguments cannot be characterized as improper. *State v. Ricks*, 136 Ohio St.3d 356, 361, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 43 (where prosecutor referred to statement of non-testifying declarant). These closing arguments could have been made even in the absence of the testimony on the tip. We turn to evaluate the admissibility of the detective's testimony as to the content of the tip.

{¶ 77} The trial court typically has broad discretion in admitting or excluding evidence, and the exercise of that discretion will not be disturbed absent material prejudice. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343, 350 (1987). However, Appellant complains the "double hearsay" involved in the detective's statement was testimonial and prohibited by the Confrontation Clause. It has been stated that a de novo standard of review is applied to a claim that a criminal defendant's rights have been violated under the Confrontation Clause. *State v. Barnette*, 7th Dist. No. 11MA196, 2014-Ohio-5673, 2014 WL 7339076, ¶ 26.

{¶ 78} The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right *.*.*. to be confronted with the witnesses against him." The clause prohibits the admission of testimonial statements of a non-testifying witness unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (victim's recorded statement to police was testimonial). The testimonial character of a statement separates it from other

29

hearsay which is not subject to the Confrontation Clause. *Davis v. Washington*, 547 U.S. 813, 821–822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (911 call during domestic dispute was not testimonial due to on-going emergency; victim's statement after being separated from husband and questioned by police was testimonial due to the primary purpose of proving past events relevant to later criminal prosecution).

{¶ 79} "But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Michigan v. Bryant*, 562 U.S. 344, 358–359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). The primary purpose of an interrogation is ascertained through an objective analysis of the circumstances of an encounter and the statements and actions of the interrogators and those making a declaration. *Id.* at 360, 131 S.Ct. 1143. The severity of the victim's injuries, the informality of the encounter with the declarant, the use of a gun, the absence of an identification of the suspect, the danger to the public or the victim, and on-going emergency are all relevant considerations in determining the primary purpose. *Id.* at 364–366, 131 S.Ct. 1143 (police questioning of victim of shooting who was waiting for emergency medical services).

{¶ 80} Here, we have a tip the day after a shooting provided to the detective by relatives of the victim, which prompted him to investigate a person with a certain nickname from the neighborhood who drives a green SUV. Appellant recognized that even if the statement was testimonial, "there is no dispute the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " *Ricks*, 136 Ohio St.3d 356, 995 N.E.2d 1181, at ¶ 18, citing *Crawford*, 541 U.S. at 59, fn. 9, 124 S.Ct. 1354.

*Mitchell*, 62 N.E.3d at 839-841. The state appellate court then conducted harmless error

analysis, as follows:

{¶ 86} In speaking of harmless error, Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* Evid.R. 103(A) (error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and a timely objection was made). To ascertain whether substantial rights were affected, a court must evaluate prejudice to the defendant. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, 27. Courts are to focus on the impact the offending evidence had

30

on the verdict and the strength of the remaining evidence. *Id.* at ¶ 25.

{¶ 87} To ascertain "whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence and evaluate the remaining evidence." *Id.* at ¶ 29 (adding the error is harmless if there is overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction). In sum, a prejudicial error that improperly affected the verdict is to be excised, and the remaining evidence is to be weighed to see if there is evidence beyond a reasonable doubt of the defendant's guilt. *Id.* at ¶ 33. *See also State v. Harris*, 142 Ohio St.3d 211, 220, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37 (a case involving a constitutional error, which noted that Morris dispensed with any distinction between non-constitutional and constitutional errors when conducting a harmless error review).

{¶ 88} The law recognizes errors are made in a typical trial and a defendant is not entitled to the perfect trial. *United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) ("there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial."). The *Ricks* Court was most concerned with the declarant being an accomplice, the two non-testimonial identifications of the defendant as Peanut, the state's case revolved around the declarant-accomplice, and other distinguishing facts. The Court's focus was not on the bare fact someone told the officer to investigate Peanut.

{¶ 89} In our case, the tip led the detective to investigate individuals with the nickname Smoke who drove a green SUV (and lived in the neighborhood). The detective's conduct was relevant, equivocal and contemporaneous with the statements. In urging prejudice, Appellant suggests the tip directly connected him with the shooting by using his nickname. Yet, the tip did not identify Appellant as Smoke. Rather, the testimony of an eyewitness identified Appellant as the shooter, and the testimony of the victim's girlfriend identified Appellant as Smoke.

{¶ 90} Additionally, the jury had already heard testimony on these subjects. The investigation of Smoke due to a tip was cumulative of the concerns expressed by the victim's live-in girlfriend to the detective and to the jury as she testified. She disclosed the same information plus additional facts: the victim did home and car repairs for their neighbor, who lived three doors down; the neighbor's nickname was Smoke; he drives a green SUV; he seemed upset with the victim in the time leading up to his death; he came looking for the victim multiple times in one night; the victim seemed to be avoiding Smoke; the neighbor's behavior was strange and made her nervous; and the victim seemed unusually nervous during this time. Finally, as

aforementioned, she identified the defendant in court as the subject of her testimony.

{¶ 91} Furthermore, the eyewitness to the shooting identified Appellant as the person she saw standing near her house firing eight or nine shots at the victim. She reported the shooter looked at her and then entered a green SUV or truck. She identified Appellant's green Chevy Avalanche as being the type of vehicle she saw (although she did not recall the bed on the back). Another witness saw an individual leave the area by the victim after the gunshots, and she testified that he drove away in a large green truck. Plus, the victim himself made a dying declaration to the responding officer that the shooter's vehicle was a green truck. At the time of his arrest, Appellant admitted he was the sole driver of the green Chevy Avalanche parked in his driveway.

{¶ 92} Under the circumstances of this case, this court concludes any error in the admission of evidence contained in the tip was harmless beyond a reasonable doubt. Due to the other evidence, the prejudicial impact of the evidence was not high. If we excise the tip and evaluate the remaining evidence, the state proved beyond a reasonable doubt Appellant was the shooter. This includes the evidence mentioned immediately supra and the evidence in our statement of the case, including the victim's 911 call prior to the shooting, which reveals his assailant was accusing him of stealing and asking him to enter a vehicle. This assignment of error is overruled.

*Mitchell*, 62 N.E.3d at 843-844.

Applying the standards set forth in *Chapman v. California*, 386 U.S. 18 (1967),

*Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), and *Brecht v.*

*Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), Mitchell argues the state

appellate court's "harmless-error analysis is contrary to clearly established federal law." (Doc.

No. 7 at 14, 15.) He asserts "no reasonable jurist employing the proper harmless-error analysis

would could [sic] determine that Det. Martin's testimony was harmless beyond a reasonable

doubt." (*Id*. at 15.) In this regard, Mitchell emphasizes "without the tip – that Smoke shot Mr.

Haskins – the jury would be left only with Ms. Stilson's identification of Mr. Mitchell and the

decontextualized testimony of Ms. Jones that Mr. Mitchell is nicknamed Smoke." (*Id*.) He

argues the "tip is what gives corroborative meaning to Ms. Jones' testimony" and "doubtlessly influenced the way that the jury considered Ms. Stilson's testimony and reached a guilty verdict." (*Id.* at 15, 16.)

Respondent argues the state appellate court's harmless error analysis is entitled to AEDPA deference. (Doc. No. 5 at 21.) He notes the other evidence supporting Mitchell's conviction, including eyewitness testimony identifying Mitchell as the shooter, the victim's 911 call, and the testimony of Crystal Jones. (*Id.* at 27, 28.) Respondent argues "because Crystal Jones testified as to the same 'tip' that their neighbor 'Smoke' a.k.a. Janero Mitchell, owned a dark green SUV, Mitchell cannot show that the state court's harmless error determination regarding [Detective Martin's] cumulative testimony" was in error. (*Id.* at 28.)

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused, applicable to the States by way of the Fourteenth Amendment, "to be confronted with the witnesses against him." U.S. Const. Amend. VI.. The Supreme Court has held the Sixth Amendment Confrontation Clause serves to bar out-of-court testimonial statements unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). One of the central purposes of the Confrontation Clause is "to allow the defendant the opportunity to cross–examine the witnesses against him." *Barnette, Jr. v. Bunting*, 2016 WL 8578116, *8 (N.D. Ohio Aug. 29, 2016). *See also Davis v. Alaska*, 415 U.S. 308, 316 (1974)("Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested.").

A violation of the Confrontation Clause does not warrant automatic reversal and is subject

to harmless-error analysis.  *See Van Arsdall*, 475 U.S. at 681-682, 106 S.Ct. 1431; *Blackston v. Rapelje*, 780 F.3d 340, 359 (6th Cir. 2015); *McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015).  The Supreme Court recently explained the contours of harmless error analysis, as follows:

> The test for whether a federal constitutional error was harmless depends on the procedural posture of the case. On direct appeal, the harmlessness standard is the one prescribed in *Chapman [v. California]*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [1967]: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.*, at 24, 87 S.Ct. 824.
>
> In a collateral proceeding, the test is different. For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht [v. Abrahamson]*, 507 U.S. [619] , 637, 113 S.Ct. 1710 [1993], 123 L.Ed.2d 353 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.' " *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht, supra*, at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (per curiam).

*Davis v. Ayala*, —— U.S. ——, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015). *see also Blackston*, 780 F.3d at 359 ("In the context of federal habeas corpus, a constitutional error will warrant relief only if the error 'had a substantial and injurious effect or influence in determining the jury's verdict.' "); *McCarley*, 801 F.3d at 665 ("*Brecht* requires a Confrontation Clause violation to have a 'substantial and injurious effect or influence in determining the jury's verdict' before it merits reversal on collateral review.").

34

Where, as here, a federal habeas petitioner challenges a state court's harmless error analysis, "he must meet the *Brecht* standard." *Ayala,* 135 S.Ct. at 2198. This does not mean, however, "that a state court's harmlessness determination has no significance under *Brecht*." *Id.* Rather, the Supreme Court has found "the *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 120, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)). Thus, "[w]hile a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.' " *Id*. (quoting *Fry*, 551 U.S. at 119-120, 127 S.Ct. 2321). *See also Blackston*, 780 F.3d at 359 ("The deferential posture of § 2254(d)(1) is understood to be 'subsume[d]' within *Brecht* review, which is itself deferential."). In other words, "[w]hen a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." *Ayala*, 135 S.Ct. at 2199 (quoting *Fry*, 551 U.S. at 119, 127 S.Ct. 2321) (emphasis in original). *see also Simmons v. Moore*, 2016 WL 5417827 at * 9 (N.D. Ohio July 22, 2016).

As noted above, "a state court decision is not unreasonable if 'fairminded jurists could disagree' on its correctness.' " *Ayala,* 135 S.Ct. at 2199 (quoting *Richter,* 562 U.S. at 101, 131 S.Ct. 770). A habeas petitioner, therefore, must show that "the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Richter*, 562 U.S. at 103, 131 S.Ct. 770).

When conducting a harmless-error analysis of Confrontation Clause violations, this Court

35

utilizes the factors outlined by the Supreme Court in *Van Arsdall, supra. See e.g., Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir.2009) ("[W]e assess the prejudicial impact of constitutional trial errors under the 'substantial and injurious effect' standard set forth in *Brecht,* examining the error by applying the *Van Arsdall* factors to the facts in the case."); *McCarley*, 801 F.3d at 665.  The Supreme Court reasoned in *Van Arsdall* that whether an error is harmless in a particular case "depends upon a host of factors."  *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431.  Those factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case."  *Id*.

With these principles in mind, the Court finds the state appellate court reasonably concluded allowing Detective Martin to testify as to the contents of a tip he received constituted harmless[3] error.  In so finding, the Court analyzes the state appellate court's harmless error determination under *Brecht* by applying the factors set forth above in *Van Arsdall*.  Applying

---

[3]     In the alternative, Respondent contends no violation of the Confrontation Clause occurred because the declarant of the tip, Crystal Jones, "also testified as to the same information and was available for cross-examination as to this 'tip.'"  (Doc. No. 5 at 27.)  Mitchell asserts the tip was provided not by Crystal Jones, but by two other individuals who did not testify, thus creating a Confrontational Clause violation. (Doc. No. 7 at 13, 14.)  In this regard, the Court notes that, although Mitchell argued the inclusion of this evidence constituted a Confrontation Clause violation under the Sixth Amendment, the state appellate court did not expressly determine whether or not such a violation occurred and instead proceeded to harmless error analysis. Regardless, the state trial court admitted references to out-of-court statements made by individuals who Mitchell did not have a prior opportunity to cross-examine and who were not shown to be unavailable.  Neither party disputes that if a violation of the Confrontation Clause did occur under these circumstances, harmless error analysis applies.

these factors leads to the conclusion this portion of Detective Martin's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict.

Applying the first *Van Arsdall* factor (i.e., the importance of the testimony in the prosecution's case), the Court finds this factor weighs mildly against the State.  Indeed, the testimony regarding what two of the victim's relatives had told Detective Martin was important as it provided context as to why the Detective Martian began to investigate individuals "who went by the name of Smoke who drove a green SUV and lived in the neighborhood."  (Doc. No. 6-5 at Tr. 54.)  While this "tip" provided by the victim's relatives may not have been the cornerstone of the State's case, it did serve a role in reinforcing other evidence against Mitchell, including the testimony of Crystal Jones and Patricia Stilson.

The second and third factors, however, weigh in favor of the State.  As noted *supra,* the second factor under *Van Arsdall* is whether the testimony was cumulative in nature.  The tip provided to Detective Martin was not the only evidence linking the murder to an individual named Smoke who drove a green SUV.  Carrie Spires testified she saw large green truck drive away from the victim's body.  (Doc. No. 6-4 at Tr. 72-73.)  Crystal Jones testified Mitchell went by the nickname "Smoke," was upset with the victim just prior to the murder, and drove a green SUV.  (*Id*. at Tr. 81-84.)  Patricia Stilson, who testified she saw Mitchell shoot the victim, stated Mitchell left the scene in a dark green SUV.  (Doc. No. 6-3 at Tr. 48-51.)  Prior to the victim's death, the victim told police an individual in a green truck had shot him.  (Doc. No. 6-6 at Tr. 27.)  Considering the similarities between all this evidence and the tip offered to Detective Martin, the Court finds the testimony at issue to be cumulative in nature.  Moreover, all the above listed testimony provides evidence corroborating the out-of-court tip offered to Detective

37

Martin, tipping the third *Van Arsdall* factor (i.e., the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points) in the State's favor as well.  *See Norman v. Bradshaw*, 2006 WL 3253121, *14 (N.D.Ohio Nov.8, 2006)) "[w]here a jury hears testimony that essentially reiterates [the statements at issue] without adding any additional damaging testimony, no substantial and injurious effect or influence is injected into the trial.")

The fourth *Van Arsdall* factor, the extent of cross examination otherwise permitted, weighs slightly against the State.  As the individuals who provided the tip to Detective Martin did not testify, Mitchell was unable to cross examine them concerning their allegations and motives.  However, all the other witnesses who testified regarding an individual named Smoke and the green vehicle were permitted to be extensively cross examined.  Indeed, the cross examination of Patricia Stilson, the eyewitness to the murder, spans over sixty pages.  (Doc. No. 6-3 at Tr. 61-102; 118-121; Doc. No. 6-4 at Tr. 1-11; 15-16.)  Ms. Stilson was cross-examined at length by defense counsel regarding virtually every aspect of her story, including her identification of Mitchell in a lineup and her ability to discern colors.  (*Id.*)  Similarly, the state trial court allowed for a comprehensive cross examination of Carrie Spires and Crystal Jones. (Doc. No. 6-4 at Tr. 75-78; 86-87.)

Finally, the Court finds the fifth *Van Arsdall* factor, "the overall strength of the prosecution's case," weighs in the State's favor.  Had the jury not heard and considered Detective Martin's statements regarding the tip he had received, the State still would have presented a strong case against Mitchell.  The eyewitness identification by Patricia Stilson was far more significant to the State's case than the fact Detective Martin had acted on a tip.  In addition to

Ms. Stilson, the State also presented testimony from Carrie Spires, who saw a green vehicle drive away from the scene, and Crystal Jones, who testified Mitchell drove a green SUV and had been increasingly upset with the victim in the weeks prior to the murder.

Mitchell argues "given Ms. Stilson's colorblindness, brain injury, and multiple identifications of suspects who were *not* Mr. Mitchell . . . the tip doubtlessly influenced the way that the jury considered Ms. Stilson's testimony and reached a guilty verdict." (Doc. No. 7 at 16.)(emphasis in original)  The Court acknowledges that, while the testimony regarding the tip received from the victim's relatives might have slightly bolstered Ms. Stilson's credibility with the jury, it did not have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht, supra*, in light of the wealth of evidence introduced against Mitchell at trial.  Indeed,  Crystal Jones, Carrie Spires, and the victim himself provided similar information to what was contained  in the tip, serving to support Ms. Stilson's version of events.  Therefore, the fifth *Van Arsdall* factor strongly weighs in favor of the State.

In sum, the Court finds the state appellate court's harmless error determination was not unreasonable; i.e., it was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Ayala,* 135 S.Ct. at 2199 (quoting *Richter,* 562 U.S. at 103, 131 S.Ct. 770).

Accordingly, and for all the reasons set forth above, the Court finds Mitchell's second ground for relief without merit.

39

## V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date:  December 6, 2018                          *s/ Jonathan D. Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**